Thank you, Your Honor. Good morning, Your Honor. It's John Lemon for Jocelyn Casado. Co-Defendant Counsel, again, I have allotted you 15 minutes to address the lay and expert opinion issues and my client's sentencing issues. I'd like to reserve four minutes of that time for rebuttal, if I may. We'll keep track of your time. Good. Thank you. The trial court here permitted the government to present the unnoticed opinion testimony of the case agent who testified for three days based on her expertise with this particular street game and the Mexican mafia as to the identities and putative roles of alleged gang members and the defendant's collective guilt. The court also permitted a dual role expert to bounce back and forth between purportedly expert and lay opinions without identifying a proper foundation for either. The court then instructed the jury that it should evaluate all this opinion testimony the same way. In other words, the court made no distinction between lay and expert opinions when it told the jury how to evaluate this testimony. This court held in United States v. Reyes Rivera and in United States v. Rodriguez that similar failures by the trial courts there were error. Because the errors here violated the confrontation clause, the question before this court is whether the errors were harmless beyond a reasonable doubt. This court reviews de novo a district court's interpretations of the legal standard for its decision and whether particular evidence falls within the scope of a rule is also reviewed de novo. And here the court may express findings about what the court believed the law to be. So de novo review applies here. If expert evidence is wrong... Excuse me. It seems to me that what really your quarrel is is how the district court applied our precedence concerning lay and expert opinion. We have quite a few of those cases and it seems to me that it's really an application question, not a question of law. It's a murky area and other circuits deal with it differently, but our circuit does allow a single witness to do both. That's true, although with respect to dual role testimony the court does allow that. The salient point and the big issue here is that Starkey was not noticed as an expert. She was simply going to be a lay witness who was going to testify about her involvement as a case agent. Let me ask you a question about that. First of all, I'm going to assume that it's expert testimony, although it appears to me that she pretty clearly talked about her own knowledge based on listening to thousands of calls and studying this herself. And that is her own perceptions, but assuming that it is expert testimony, why is it harmful to your client? Wouldn't a jury give more weight to it if she were identified as an expert than if she's simply a lay opinion witness who's describing her investigation? Well, I think maybe we're getting a little bit ahead of ourselves. Even if the government had noticed Starkey as an expert, that doesn't mean that her opinions would necessarily have been admissible. And we will never know because the court advocated this gatekeeping function to ascertain whether there was a sufficient foundation for any of these opinions. So, in preparing for this argument, I tried to play the hypothetical game. Can you identify specific testimony that in your view was generic expert testimony, as distinct from saying, I personally have studied this gang and listened to these tapes and come to these conclusions, which would not be expert testimony. I have to respectfully disagree about that. She specifically told the jury that this gang was her gang of expertise. And the only case that I'm aware of where the Ninth Circuit has said that a lay witness may offer an opinion as to the roles of an individual within an organization is when we're talking about an unsophisticated, generic organization, and the opinions are tied specifically to admissible evidence. Okay, but that really isn't about expertise. You're talking about the organizational chart? It seems to me that that's a lack of foundation problem rather than an expertise problem. Except, Your Honor, we're talking about the Mexican mafia. This is traditionally an area of what's considered a gang expert in this milieu. This gang is, according to the government, this is a sophisticated gang. And this particular witness had reviewed 70,000 calls specific to the interaction of the Florencia 13 gang with the Mexican mafia. So this is arguably a provocation. Right, but she did that herself. In sort of theoretical terms, if an investigating officer listened to three calls and said, this is what I heard and this is what I think it meant because of the context, why is that expert as opposed to just voluminous but not expert? Because she also testified that she had spoken to numerous informants that she had learned from other law enforcement agents about the gang, that she had studied the gang. Her opinions were, I submitted a lengthy chart as to the volume of her opinions that were very specific. And they went beyond, I think this guy was working for this other guy. For example, she testified that the role of secretary is important to the F13 gang. This structure cannot function without secretaries. Giselle Casado is a secretary. And that was purportedly based on her knowledge of the investigation. Her knowledge of the investigation, first of all, included inadmissible testimonial hearsay that she learned from interviews from gang dropouts and also was based on what she had been told by other agents. But there was no effort whatsoever to tie that opinion to anything that was admissible at trial. Just because she says I'm basing my opinion on my review of jail calls, not everything in a jail call is admissible. Now, perhaps a lot of it will be admissible under the co-conspirator hearsay exception, but not everything in a jail call is going to be admissible. And unlike in, I believe it's Taralba Mendia, there was no effort here to tie her opinions to evidence that was admissible. It was a free-for-all. As long as she said it's based on my knowledge of the investigation or that it's based on my review of jail calls and wiretaps, whatever she wanted to say was immediately admissible. And this court has never gone that far. The Second Circuit in United States v. Garcia also addressed this problem. And they, in that case, they have some instructive language. They state that when an agent relies on the entirety or totality of information gathered in an investigation to offer a lay opinion as to a person's culpable role in a charged crime, she is not presenting the jury with unique insights or evidence. of an eyewitness's personal perceptions as required by Rule 701. And they also said that the foundation requirements of 701 do not permit a law enforcement agent to testify to an opinion so based in form if the agent's reasoning process depended in whole or in part on her specialized training and experience. And again, Starkey specifically told the jury that this was her expertise. This is far beyond the kin of an average juror. Let me ask you this. I'm sorry my picture gets fuzzy. I apologize. Possibly my reasoning also. If, again, I know you won't agree with the premise of this question, but I'd like you to assume that the only erroneous testimony and exhibits pertain to the organizational structure of the gang but not to any of the other issues in the case. Would that error be harmless or not? And if not, why not? Well, I don't believe it would be harmless. In the first place, a lay witness cannot identify individuals that she's never seen. This court said that in United States v. Beck. Her opinions have to be based on her perception. As far as the harmfulness of just the chart, her other opinions flowed from the chart and they were highly damaging. I guess if you're asking me was the chart the most prejudicial thing in the case, I don't believe so, but certainly your statement that I think the individual's name was Ulloa had received a hot shot and his overdose was not an accident, which was based on what she had been told by other officers, that was an extremely damaging statement that was based on testimonial hearsay. And why was that? I mean, I don't understand if she had implicated or suggested that one of the defendants was involved in that, but as I read her testimony, she just said that she thought some unspecified person had had him killed. Why was that prejudicial? Well, I'll let my co-counsel address that. I believe there was an implication of one of my co-defendants on this appeal in that statement, but I'll let them address that. Another issue here, well, before we get, I'm sorry, Your Honor, before I circle back to your question, Judge Graber, about the harmfulness of this, there was, the jury, this is compounded by the fact that the judge misinstructed the jury and told them to treat all these opinions the same. And that was something that was commented on by this court, specifically in Reyes Rivera and in Rodriguez, because when the court fails to instruct or affirmatively misinstructs the jury that lay and expert opinion testimony should be treated the same, it's giving an improper imprimatur of reliability to the lay opinions. And here we had three days of lay opinions from Agent Starkey, and the trial court told the jury that basically she was an expert, even though she wasn't. So that goes directly to the harm. We also had the issue of, at some point, the court is going to need to find some of this to be prejudicial or else the government's never going to be deterred from simply making an end run on Rule 16, pretending that all of its expert testimony is really lay opinion testimony, knowing that they'll argue on appeal that, well, we could have admitted it anyway had we noticed the witness as an expert. And I guess, finally, with respect to that, that argument also assumes that the foundations for expert and lay opinions are fungible, that just because the government, if the government had chosen to notice Starkey as an expert, that they could have laid a sufficient foundation for all of her testimony to be admissible. Again, that's clearly not the case when she was testifying as a hearsay conduit, explicitly testifying as a hearsay conduit, and we don't know whether that would necessarily have been the case for some of her other opinions about the organization of the gang. And I see I have two minutes left. I'd like to switch gears and briefly touch on my client's sentencing issues. Mr. Bisno, I believe, is going to address the issue related to the jury instruction on coping spirit of drug liability. I'm going to skip ahead to the trial court increasing my client's guidelines from a base offense level from 30 to 32 without addressing any of the factors under USSG 1B1.3. In other words, the trial court made no effort to determine whether when she made that increase from 30 to 32 based on drug quantity, that that drug quantity was either reasonably foreseeable or jointly undertaken. And then, similarly, with respect to minor role, Ms. Quesada requested a minor role reduction, which the court denied. And the court, neither the government, nor the probation officer, nor the court, nor the defendant addressed Amendment 794 to Section 3B1.2. And this court held in United States v. Diaz that when a court does that, it's error, and that the defendant is entitled to a new sentencing hearing to have the court address the issue of minor role under Amendment 794. So with that, if I can preserve the rest of my time for rebuttal. You may. Thank you. The next person to speak will be on my list, Mr. Visno. And, yes, five minutes for you. Thank you, Your Honor. May it please the court. I'm just going to address the court on the question of drug quantity, which, of course, in federal criminal cases is extremely important because it sets the mandatory minimum. And in this case, the court really didn't give what I would call an instruction on drug quantity. It just said, hey, jurors, in its instructions, we're going to ask you to decide the drug quantity. And then in the jury verdict form, it said that if you find the defendant guilty, we find that he or she was responsible for blank grams. And our contention is that that was plain error, that the court should have... It was at the time, but doesn't Colosso sort of make it retroactively correct the way it was instructed? Well, I don't... Our position is that Colosso does not... still creates a plain error here because what happened in Colosso was that the trial district court there had instructed in the alternative, you can find the defendant liable for a quantity of drugs that they reasonably saw or which fell within the scope of the agreement. And the Colosso court clearly held that that instruction was erroneous, that they didn't have to prove intent, knowledge, scienter, mens rea. And in footnote 9 of Colosso, they specifically said that Pinkerton was wrong when it talked about... Pinkerton does not extend its discussion of foreseeability to the idea of drug quantity. It only applies to the substantive offensive conspiracy. So that was very clear in Colosso, but then Colosso went and gave the remedy. And the remedy creates a unclearness and shows that our trial court committed plain error. Because what the remedy was, and this is at page 1335 to 1336, they sent it back to the three-judge panel and they say, you have to determine whether there was harmless error. That is, whether there was overwhelming evidence that each defendant entered into an agreement involving the requisite drug type and quantity. That sentence there, that you have to determine whether each defendant entered into an agreement involving the requisite drug type and quantity, that is a scope of agreement language. And it seems to me that it really means that it's still plain error for our court not to have said that the jury has to be instructed on scope and agreement. Well, counsel, let me just ask you specifically this. The jury found the amount of drugs in which each person, I'm looking for your client, there's a long list here, but for example, one of the individuals found, they found beyond a reasonable doubt that the conspiracy in which the defendant participated involved less than 100 grams of heroin, at least 50 grams of methamphetamine, and so on. So these are specific jury findings. And so how does the sentencing judge deal with that in your view when the jury has made that finding of amount that the conspiracy in which the person was involved dealt with a specific quantity of drugs? Can the judge lower the drug quantity from what the jury found? Well, no, I don't think so once they've found that minimum. But the problem is they weren't correctly instructed. If a correctly instructed jury had found that, it would be a different question. But they should have been instructed as to this. You have to look at each defendant, make an individualized interpretation as the scope of the agreement. And really, to me, the key on prejudice here is if you look at, it's an excerpt of record, supplemental excerpt of record 20, page 21. It's a chart that was put in, it's in 232. It wasn't put in the evidence, but it was testified in its totality by criminalist Bordelais. And you see that's 196 grams. This is what the jury relied on. But when you look at the 196 grams, 170 was controlled sales to Cifuentes, Maestas, and Juarez. And yet, there was no evidence that my client, Mr. Sanchez, knew Cifuentes, Maestas, and Juarez. And if the jury had been properly instructed that they should look at the scope of the agreement of each individual defendant, I think there's a reasonable possibility of a different result, both as to my client and as to the other three defendants. Because none of them knew about these controlled sales. And so that's why I think that CLAWSO does leave the district court with an obligation to instruct on scope of agreement and that in this particular case, it made a difference. Thank you, counsel. You have used all your time. And we will next hear from Ms. Ivins regarding Defendant Jurado. Yes, may it please the court, I'm going to start by addressing the third issue identified in this court's order, whether the district court clearly erred in the sentencing finding, finding Jurado responsible for first-degree murder. And we start with the guideline provisions. And the probation office, of course, had conducted an analysis suggesting that the appropriate guideline provision for the RICO grouped counts that involved the assault on Mr. Acosta should be 2A2.2 for aggravated assault. And the district court disagreed and thought that it should be 2A1.1, first-degree murder. And so with that difference, the difference between aggravated assault and first-degree murder was a large swing from a 21 or 23 up to a 43. And so at a minimum, the standard, the burden of proof that was applicable for the district court to make that decision was clear and convincing evidence. And for something to be clear and convincing, it's supposed to be, coming from the Ninth Circuit's jury instructions, a firm belief or conviction that it is highly probable that the fact is true. And in this case, there was no such high probability. There was suggestive evidence. There was certainly evidence that Mr. Jurado was involved in planning an assault, a serious beating, a court out. But what the district court relied on in finding first-degree murder intention was the statement to Mr. Fazza, made by Mr. Ulloa during a telephone conversation, to smash him, Acosta, like an enemy. And I don't think that that single sentence made to a different co-defendant can bear the burden that a premeditated murder finding puts on it. What about the phone call after the murder where Jurado reports to Ulloa, that's a done deal, you don't got to worry about that punk no more. That's an odd thing to say if you had just killed someone and you hadn't planned to kill him, isn't it? You know, whether it is an odd thing to say, and we spent a lot of time at this trial talking about the interpretation of gang language and gang culture, I do not think that for one gang member to say to another gang member that's a done deal, whether or not he had any intention for it to happen or not happen, or he was surprised or not surprised, I don't think that really can also bear the weight of a clear and convincing premeditated murder finding. It is a done deal. I mean, that was a true statement, that it was a done deal, as in, he's dead, he's not going to bother Ulloa or bad talk him anymore, or say he's a snitch. And this expectation that somehow he's also supposed to then, in that call, say, hey man, I didn't know that was going to happen, this is really bad, we're going to be in trouble, I don't think there's a burden on Mr. Dorado during a call with sort of his main buddy in the gang to disclose that information. Wasn't Mr. Dorado there next to Mr. Faza, what Mr. Faza was saying? I mean, it wasn't just one statement. I mean, Faza was telling Ulloa that he's going to smash the fool, the fool's done, the fool's done, I'm going to smash him. So there are repeated statements. I mean, isn't that, combined with the post-murder conversation, enough to suggest that he was aware of this plan to kill? So, Your Honor, I don't disagree that it suggests it. There is certainly that suggestion. But I don't think it's clear and convincing. When we look at that statement to Faza that was made by Ulloa, and you look at the transcript of that, Mr. Dorado is not on the call at that time, according to the transcript, and there are two additional pages of transcript after that smash him like an enemy statement is made, where Ulloa and Faza discuss importing drugs into prison. And they're done talking about that, and then Mr. Faza says, do you want to talk to Dorado Yogi? And he says yes, and then he puts him on the phone. And as trial counsel observed at the time of sentencing, we don't know where Dorado was during that time. There's no direct evidence. There's no evidence he could have been in the bathroom. Trial counsel said he could have been getting a donut. We've got, you know, at least two pages of transcript that occur after that statement before Mr. Dorado is back on the phone. So I don't think that there is an inference that Mr. Dorado heard that statement. And in Mr. Dorado's conversation with Mr. Ulloa after he gets back on the phone, all of the language that is used references a court out or a serious beating. And he mentions that he's going to get with his click and tell them to be on the lookout for him. All of those statements are consistent with a court out rather than a premeditated murder. And so although there may be a suggestion, I don't think that the evidence as presented was sufficient for a clear and convincing finding to go from a level 21 or 23 to life in prison. And I'd like to save the balance of my time for rebuttal. You may do that. Finally, three minutes for Mr. Thompson. Good morning. Mr. Fezzah's motion to suppress the evidence should have been granted. First, there was no probable cause to search Mr. Fezzah's apartment. And there was no probable cause to believe that the suspects, any suspects at all, were still in the apartment at the time the police arrived, which was some two and a half hours after the killing itself. There were no exigent circumstances. There was no hot pursuit whatsoever. There was no chase of the suspects. As I mentioned, the killing itself occurred two and a half hours before the police arrived. There was no public safety concern. There was no indication that anybody else had been harmed or hurt. There was only one shot that was fired. There was no reports of violence in terms of physical evidence left at the scene. There was nothing that would suggest that there was persons inside that apartment where they had to take care of matters for public safety. There was no proof of any destruction of evidence. There was no flight of any suspect at the time the police arrived. People had seen persons in the area of Mr. Fezzah's apartment, but that's all it was. And then two witnesses saw them walk farther north down the street so that there was no connection to that apartment. Counsel, if I understand your argument correctly, you're challenging only the initial entry and not the validity of the warrant that ultimately led to the seizure of all of the items in question, the drugs and the rifle and so forth. Am I correct about that? No. The warrant was obtained based upon what they found in the initial search. When they located the rifle and they located the magazine, that was the basis and premise for getting the search warrant itself. So then the items that were taken in the second search and then Mr. Fezzah's statement, all of that should have been suppressed because it was all part of the initial improperty. What they later seized is, if you excise what they saw upon the first entry, why wasn't the remainder of the warrant application sufficient to justify the second seizure of these items pursuant to the warrant? I don't think you could excise what it is that they saw in the apartment that would cause them to be justified to go back and to look for drug evidence. When they went back, they did not find any evidence, if you will, of violence. There were no guns, there were no other magazines filed. They found 26 items that might be related to drug-type evidence. So I don't think excising the first part from the warrant would allow there to be a sufficient basis for going back into the apartment. Because the only reason they went into the apartment was because they believed there was something going on there, but there was no probable cause to go to the apartment. There was no probable cause to get the key to try to enter the apartment when no one answered the door. And then ultimately, Mr. Fazard did open the door. So I don't think that there's any good faith exception to that. I don't think that the police officers can in any way justify the improper or invalid search that was conducted in the case. Thank you, Counselor. You've exceeded your time. I'll save the rest. You don't have any more. Sorry. We'll hear from the government. May it please the Court, Victoria Dix-de-Rova, on behalf of the United States. Your Honors, I'd like to begin by addressing the testimony of Special Agent Michelle Starkey and specifically the questions that Your Honors had regarding the organizational chart and her testimony about various people's roles in the organization. Now, the defendant's suggestion that only experts can testify about the Mexican Mafia or people's roles in a gang, that's not supported by this Court's precedent. In United States v. Beck... But, Counsel, let me ask you specifically about the chart. I think when I was talking to the opposing counsel, I asked about foundation. It could be lay testimony. For example, you could have somebody say, I know that so-and-so played the role of secretary because she said X, Y, Z to this other person and because I noticed that she reported back to so-and-so. But what I was wondering about is where is the foundation for the conclusions that are drawn on the chart? That's why I'm asking you about foundation. The entire discussion of the chart was framed in terms of Agent Starkey's knowledge of the investigation for personal participation in the investigation. So, for example, looking at the testimony about secretary on page 1192 of the government's excerpt of record, the question was asked based on your knowledge of this investigation, is the role of secretary important to the excerpt from the game? And while Agent Starkey did not lay out, well, I'm basing this testimony specifically on this prison visit video or specifically on this call... No, but how did she know which names to plug into which positions? Based on the evidence, including the evidence that was presented at trial. So, again, looking at the jury received evidence that showed that Giselle Casado's role was a secretary. The jury actually heard three videos of secretaries visiting Laredo, the leader of the gang, in Pelican Bay, and that included two videos of Casado. So they saw her interacting with the leader of the gang in her role as a secretary. How did they know when a witness testifies about a chart or an exhibit, normally they will explain why they know how to put it together the way they put it together and not just put it in there and hope that some other evidence somewhere else will come in. So I guess that's what I thought seemed potentially problematic. So in this case, Agent Starkey testified simply that it was based on her knowledge of this investigation. But even without detail as to why she filled it in the way she filled it in. Specifically in testifying about the chart, she did not provide that detail. She did later testify about various wiretap calls,  So she in other parts of her testimony testified about the specific evidence that, for example, if that testimony was, if that limited testimony regarding the chart was admitted erroneously, that error would have been harmless because the jury did have the underlying evidence which showed everybody's roles. The jury heard I believe a total of 32 jail calls, 26 wiretap calls, 3 prison visit videos. They had testimony from 3 cooperators who were team members and explained various people's roles. They saw controlled purchases, drug seekers. They did have testimony from Lieutenant Velasquez who testified almost entirely as an expert and who also testified about the secretary's roles. So even without Agent Starkey's testimony that Giselle Pisado was a secretary, the jury heard ample evidence that showed that she was a good secretary. She visited the leader of the gang in prison on 11 separate occasions in about 2 years. They heard evidence about the importance of that role, about communications, about her managing proceeds. So there was abundant evidence that corroborated and supported the testimony that Agent Starkey provides. And that is true for all of the testimony that the defendants challenge with regards to Agent Starkey. The jury had the underlying wiretap calls, jail calls, cooperator testimony, drug seizures. All of that was available to the jury to evaluate Agent Starkey's testimony. Now, the jury instruction that the court provided regarding dual role of Agent Starkey, that was actually provided at the request of the defendants. So that would be a review for plain error, as defendants did not object at the time and again actually requested that the jury instruction be given. And that jury instruction did not, was not plainly erroneous and it also did not use the word expert. And it actually made clear that Agent Starkey's testimony should be treated like any other testimony in the case. Additionally, defense counsel stated that Agent Starkey was never noticed as an expert, but in fact, out of an abundance of caution, the government had provided expert notice for Agent Starkey. And that can be found on pages 3187 to 88 of the government's excerpt record. Defendants never challenged that expert notice and for that reason as well, any error, for example, in giving a jury instruction was harmless in this case. Now, unless the court has additional questions regarding Agent Starkey's testimony, I would like to move on to the next issue So, with regards to drug quantity, I agree with the court's statement that in light of this court's decision in United States v. Colosso, the instructions here were correct. So, in Colosso, defense counsel acknowledges that the court very clearly held that the government does not have to prove that the defendants had any knowledge or intent with respect to drug type and quantity. And when this court remanded due to instructional error, it was because the instructions provided in Colosso actually required more. The instructions in Colosso did require some finding of knowledge and intent, which was erroneous. So, in stating that this court was remanding to determine if there was evidence that defendants entered into agreement that involved the requisite drug type and quantity, it's not the same as stating that there had to have been some kind of intent or knowledge. Let me ask you about how this works out in practice. Let's say that five defendants all participate in a conspiracy to sell 100 kilos of a particular drug. So, we know that they've all participated in the conspiracy. Does the full amount is attributable to each defendant? Does it have to be the full amount that's involved in the conspiracy that they've joined? Or, at sentencing, can the judge and must the judge narrow it to, in some way, to represent that individual defendant's level of participation? For example, if one defendant, in my hypothetical, can that defendant be responsible only for 50 kilos of my hypothetical drug? So, help me out. Yes, Your Honor. So, the standards for the drug quantity finding at trial by a jury and then at sentencing  are different. And, at trial, under Palazzo, as long as the defendant which, here, the jury was instructed on that conspiracy standard, then, under Palazzo, the defendant would be responsible for the entire drug type and quantity that was involved in that agreement that the defendant entered. At sentencing, for guidelines purposes, it's a different standard. Under the guidelines, the court has to look at relevant content. And there, the defendant would be responsible for all reasonably foreseeable drug quantities distributed by others acting within the scope of the conspiracy. So, here's my question. More specifically, you explained that it can expand by looking at additional relevant conduct. But can it also contract? If the jury has found that someone entered a conspiracy that involved 100 kilos of X, is the judge permitted to narrow that in any way to 50? Or is 100 a given that can only go up? Because the standards are different, so the jury is finding something different than the judge is finding, I believe, theoretically, yes, the judge could say that the conspiracy involved X amount of drugs, but, in fact, it was only reasonably foreseeable for the defendant that smaller amounts would be involved. Now, the mandatory minimum that the jury is finding would, of course, still apply, but a judge could make a different judgment. In this case, however, that does not. Here, the court did not clearly err in determining that more than 150 grams of methamphetamine was reasonably foreseeable to each defendant, and that that amount was distributed within the scope of the court. I can go through the evidence that shows why it was not, why that finding was supported by the evidence and not clearly erroneous for each defendant. I don't require that, but you're welcome to argue as you see fit. Right. Well, one of the things that defendants challenge especially is that Següentes and Maestas from whom the government made controlled purchases of drugs were not the defendants or maybe did not directly interact with the defendants. That's not the standard. The standard is reasonable foreseeability, and here there was evidence that Següentes and Maestas were part of the same conspiracy. They were working with the same co-conspirators, Ulloa, Lopez, there was also additional evidence for each defendant showing that each defendant had been involved in the game for a long span of time, a couple of years, showing that each defendant was involved directly in the game's drug trafficking activities. So whether it's Sanchez who was actually selling drugs out of the game's casinos where he worked and provided security, defendant Dorado who was involved in smuggling drugs into jail on behalf of Ulloa, defendant Bazard who was selling drugs out of his house 15 to 20 times a day, and for all of those there were actually seizures from those defendants of drugs, and then defendant Casado who was the secretary, trusted confidant of Lopez who himself was involved in a wide variety of drug trafficking activities. And who in fact helped Lopez collect the drug proceeds and extortion and taxes that were generated as a result of the drug trafficking. There was also testimony from a cooperator, Acosta, that he discussed the gang's drug trafficking extortion with Casado. So while theoretically the court for guideline purposes could have reached a different conclusion than the jury, here the court's finding was supported by the evidence and not clearly erroneous. Now, unless the court has additional questions on drug quantity, I would like to move on to the issue of the first degree murder. Yes, I will just, speaking for myself, say that I have some concerns about this. Just to be, you know, put it on the table. It's quite clear that Dorado attempted to commit an assault. But I have difficulty seeing that Dorado, as distinct from Faza, that there's clear and convincing evidence of an intention to kill before the killing happened. So I'd appreciate your responding to that. Yes, Your Honor. That's a preliminary matter. The court's finding, the sufficiency of the evidence supporting the court's finding is reviewed for clear evidence. That's the standard that we're working under. And here, the court's finding was not clearly erroneous. It was supported by the evidence and I can walk through that. The first piece of evidence that was vitally important was the call that occurred the day before the murder on March 13, 2010. And that was between Dorado and Ulloa and Faza jumped in So Dorado was the one who first alerted Ulloa that the victim, victim RA, had been telling others that Ulloa was cooperating with law enforcement. Initially, Ulloa simply ordered a violent beating, a cord out of the hood. But Dorado then informed Ulloa that victim RA was actually claiming to have a type, written evidence, that Ulloa was cooperating with law enforcement. Because if he was claiming that there was written evidence that Ulloa was cooperating with law enforcement, that could have meant death for Ulloa. Well, it's clear that, it's clear that Ulloa told Faza to kill Acosta. But, um, I, I don't, that doesn't necessarily mean that he told Dorado or that Dorado agreed ahead of time. The evidence of what happened after that kill order was given, I believe does establish that Dorado knew that there was a kill order and intended to follow that kill order. So after Ulloa told Faza to smash the victim like an enemy, a few pages later in the transcript, Dorado got back on the line. And there's no doubt that he heard the order because when he got back on the phone with Ulloa, he assured Ulloa that Faza would carry out the order. He said, don't trip my boy. The fool terrorist referring to Faza, I know he's going to get at him. So this indicates that... But, well, it's quite ambiguous, it seems to me. Get at him is a little bit different than get him. I know it's only one word difference, but to get at somebody doesn't necessarily mean more than an assault. And I think it's important to look at it in the context of all of their conversations, not just at that statement. So here, Ulloa had just given Faza a kill order. When Dorado gets back on the line and says that Faza is going to get at him, that implies that Dorado knew that Ulloa had given Faza an order, that he had heard that order. Now, later, shortly after this call, Ulloa has a call first with Victim RA and then with Lopez. He then has another call with Dorado, during which he tells Dorado about the call he just had with Lopez. And he says that Lopez was going to send his own men to do the deed, but Ulloa assured Lopez that Dorado was already on the job, and Dorado agreed that he did not need any help. So that's another piece of evidence that shows that Ulloa and Dorado were on the same page. Ulloa understood that Dorado knew what was ordered, Dorado knew what Ulloa wanted, and he didn't need help from Lopez. He would take care of it. Now, after the murder, the morning after, there was another very important call between Ulloa and Dorado. And that's the call in which Dorado told Ulloa, that's a done deal, you don't got to worry about that punk no more. Yeah, but I could have said that. After it's all done, it doesn't show that I had any participation at all. I think it's very important in context. So Dorado was involved in the initial calls with Ulloa, where Ulloa was at first ordering an assault, then a murder. If Dorado, and we have to remember that Ulloa is in jail at this time, so presumably he would not have heard before this about what happened. If Dorado truly believed that Ulloa had simply ordered an assault, and as defendants argue in their briefs, Dorado could not have, Dorado or Fazar, neither one could have just taken it upon themselves to murder another gang member. So if they had truly believed that the senior gang member ordered an assault, but in fact, victim RA was murdered, you would expect that Dorado would get on the line and explain something went horribly wrong. Well no, I don't see why that follows at all. If, I mean, leaving aside all the complexities of this, it doesn't seem to me impossible to have the person in charge say to one gang member, I want you to go ahead and kill this guy, and tell the other person, go along with so and so, he's going to go deal with this person without really specifying ahead of time, because remember this is first degree murder, so it requires premeditation. So I guess I just don't, don't see that the inferences that the district court and you draw are reasonable inferences. Well I think if, again, if Dorado truly believed that it was just an assault, presumably he would have told Ulloa that something went wrong, because he would have had to cover it up. Why? Because he doesn't know, you know, again, hypothetically, he says, whoa, I thought we were just going to assault this guy, and Faza says, no, no, separately, I got the order to kill, don't worry about it, all is well. I mean, that's just as plausible an interpretation it seems to me. I think when you combine the statement after the murder with the various calls before the murder, including Dorado telling Ulloa right after Ulloa gave the kill order to Faza that Faza would get at him, indicating again that Dorado understood what had been ordered to Faza, including that Ulloa and Dorado had another call shortly thereafter where they discussed this again, and they agreed that Dorado would in fact be the one to handle it, he didn't need help from Lopez. All of that combined, I believe is sufficient evidence that Dorado... It's completely consistent with Dorado's intention for the assault. Completely. But anyway, I don't... What about the statement in the call between Dorado and Ulloa, the part where Dorado gets back on the phone after Ulloa has talked to Faza, and he says, redacting some of the language here, I'm going to tell people from iClick, I'm just going to tell them if they run across that fool just to get him. Like, that's a little hard to understand if he thought that Acosta was going to have been murdered, right? What would be the point of going out and telling other people to get at him? How do you account for that statement? I think that statement should be viewed as a backup plan. Essentially that they have this plan, Dorado and Faza, that they would lure Victim Array and murder him as Ulloa had ordered. However, in case they don't or they can't find him or he doesn't come to them, they still need a way to make sure that other members of the gang understand that Ulloa is not a cooperator and that there are severe consequences for... But Counsel, that seems like pure speculation. I don't see any evidentiary support for that other than guesswork. But it's a backup plan? I think it's based on the fact that just before that, actually, yeah, just before that, he first says that Faza is going to get at him. So that's the primary plan that Faza would do. And then later, in the call right after Ulloa has spoken to Lopez, Dorado again says that he doesn't... You know, I know this is subtle, but he never says get him. He says get at him. And that is a... I mean, prepositions are small, but there's a different meaning to that. That's true. He says get at him. But he says that... Right. Which is different. To get him means, potentially, to kill somebody. To get at someone means to find them and do something to them, perhaps. But it just has a different connotation. He's in, again, out of any context, that might be the case. But here, he said get at him right after Ulloa had given the word. So because there was no... Faza got off the phone and immediately gave it to Dorado. There was no break for Faza to, on the side, tell Dorado what happened. It means that Dorado had heard the kill order. He understood that and... I don't understand. Please end the conversation. It wasn't necessarily a kill order. What he heard was smash him, I'll smash that fool down. That fool's done. Hey, hey, hey. So that, you know, maybe that equals kill to every reasonable listener. But, again, I don't know. I think in this case, though, the evidence... We have to remember that the standard by which we're reviewing the district court's findings is clear error. And, generally, an appellate court should defer to the district court's determination of credibility of witnesses. The district court heard the calls as opposed to reading transcripts. Heard the laughter, which she described as an indication of pride or a pat on the back between two murderers. So the district court heard all of this evidence, including evidence from Acosta, who later investigated the murder and did not speak to Dorado, but spoke to Fazar and spoke to Ulloa. So taking all that into account, that there were these statements made by Dorado and to Ulloa, both before the murder and immediately after the murder, and the deference that should be afforded to the district court's review of this evidence, the government would submit that there is no... It was not clearly erroneous for the district court to find on this evidence that Dorado did, in fact, intend to kill Victor Moret. But the district court still had to find it by clear and convincing evidence. Do you agree with that? In the first place? Yes. I'm just trying to wrap my head around clear error, you know, at our level, with clear and convincing evidence at the district court level. I'm trying to wrap my head around how to weigh that. The district court certainly had a higher standard in making the finding initially, but once you did, that finding would be reviewed for clear error. But that's an interesting question that Judge Lee raises. This is a hypothetical. Let's suppose we look at the record and we say, well, 51% of the evidence is in favor of what the district court found on a fact, but that's really not clear and convincing. It's kind of barely sufficient. So when we look at that for clear error, is that clear error because the district court didn't meet the clear and convincing standard? I don't know that I can give it an exact number, but... The principle, though. I'm asking you for the principle. I think the principle under clear error would be that even if this court were looking at the evidence in the first instance, even if this court decided that it would have found differently, that's not sufficient for clear error. Even if the standard below is clear and convincing? That's right. Because clear and convincing is not absolute proof. It's not beyond a reasonable doubt. No, that's why I asked the question that I asked about 51% and two-thirds. If we say the district court had 51%, but we think clear and convincing means 65%, and 51% isn't good enough, what's the answer on appeal? I don't know. I think if... If the court... finds... I think under the clear error standard, if the court finds that... there was sufficient evidence to meet the clear and convincing standard, that would not be clear error. Again, even if this court perhaps would, on first instance, reach a different conclusion. Thank you. Thank you. And seeing that I am running out of time, unless the court has any further questions, then I would submit on these. I don't see a hand raised literally or virtually by my colleagues, so I think not. Thank you. On the defense side, there are two of you who have some rebuttal time remaining. The first is Mr. Biddle. Thank you, sir. You have to unmute, please. Your Honor, I would just like to direct the court's attention to the prejudice standard. When you look at prejudice for the lack of giving the jury instruction, and for the substantial evidence, on drug quantity, I think the government's position in front of the jury and at sentencing was that it was the chart of the methamphetamine seizures that would be the basis for the drug quantity finding. And because there's so much doubt as to all of the defendants, as to whether they participated in these controlled purchases, or knew the people who made the sales, I think that the error was prejudicial. Thank you, counsel. Thank you. And Mr. Thompson. No, it's Ms. Ivins. I'm sorry. You have some time left as well. Yes, Your Honor, thank you. Also, I think Mr. Lemon, my colleague, also had about a minute left. But I will very quickly make just a few points. One, the government refers to some paperwork that somehow escalated the situation between Ulloa and Dorado, and Dorado talked about him having a kite. At the government's excerpt of Record 588, the government expert actually defines paperwork, and a kite is not paperwork within the meaning of that term. You need a court document, a jail document, or a public document that would show that the person is actually cooperating. Also, the premise here is that smash him like an enemy actually is something akin to a kill order. There is no expert evidence of that. It was the government's case agent who testified as a lay opinion witness who made that interpretation. The government's expert did not, Velazquez, and despite the government kind of pushing at him a little bit to get him to say that, it's very clear that enemies can be killed and gang members are not, that there's escalating positions, and so there is no actual evidence in the record that that is, based on expert opinion, what that means. And I think... Can I ask you just briefly, what's your answer to the question Judge Graber asked the government about how we apply clear error to a fair and convincing standard? I thought about that yesterday. I looked and did not find a case I could give you on that, but I think that the sort of the logical conclusion is this court should look and see whether the evidence could have supported on clear and convincing evidence standard the finding that the district court made. So if the evidence is at 51%, it cannot have supported a clear and convincing evidence standard which is higher by definition than preponderance. So my answer is that it's not sufficient and it's clear error under this court's review. Thank you. And my apologies to Mr. Lemon. You're absolutely correct. I appreciate the correction. You also have some rebuttal time. Thank you, Your Honor. I'd just like to go back to the big picture here very briefly. Rule 701 requires that this type of testimony not be based on specialized knowledge. And when agents testify about the inner workings of the Mexican mafia, the being on lockdown in Pelican Bay, the use of kites, the use of secretaries, the use of esoteric coded language, using women's names as code, taxing drug dealers, these are areas of specialized knowledge, which the government acknowledges that the prosecutor told us that they actually provided notice for the agent's charges and then withdrew it and decided not to present her as an expert. It says she's going to testify about these at least 14 different areas of expert subject matter and then decides, oh, you know what? Forget about it. We're not going to call her as an expert after all. And then they put her up there and ask her the exact same questions all under the umbrella of based on your training and experience. And the trial court basically held that this case agent could say anything she wanted based on your training and experience. And there was no effort whatsoever to tie any of these opinions to a specific piece of admissible evidence, for example, a jail call. Thank you. Thank you, counsel. We very much appreciate all of the arguments presented. This was a highly complicated set of cases and you've all been very helpful. The case just argued is submitted and we are adjourned for this morning's session. This court for this session stands adjourned.
judges: Graber, Miller, Lee